IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SCOTT LEE GORDON, | Case No. 17-cv-00541-DKW-KJM |
| Plaintiff, | **ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| vs. | |
| PAUL NIESEN, *et al.*, | |
| Defendants. | |

Within the span of two weeks, inmate Scott Gordon was brutally assaulted by inmates belonging to two prison gangs in a Hawaii state prison, despite Gordon having requested—after the first assault—to be separated from gang members associated with his attackers.  Alleging negligence and violations of his Eighth Amendment right to be free from cruel and unusual punishment, Gordon brought suit against Defendants Paul Niesen, a prison social worker; Keone Morreira, a corrections supervisor; and Thomas Craig, a prison doctor.[1]  Over a year ago, Niesen and Morreira moved for summary judgment on Gordon's Eighth Amendment failure-to-protect claim, Dkt. No. 62, and later moved for summary judgment on Gordon's negligence claim.  Dkt. No. 145.

---

[1] Gordon asserts challenges with finding and serving Defendant Craig.  Dkt. No. 151 at 1 n.1.

Viewing the record in the light most favorable to Gordon, a jury could find that Niesen and Morreira knew there was a substantial risk of a second assault on Gordon and, despite that knowledge, failed to take reasonable measures to avert it; namely, in processing Gordon's separation request and failing to ensure Gordon was housed in a unit where he would not have contact with members of the very prison gang intent on harming him.  Accordingly, Defendants' motions, Dkt. Nos. 62, 145, are DENIED.

## FACTUAL & PROCEDURAL BACKGROUND

### A.      The First Assault – June 6, 2016

At all times relevant to this suit, Defendant Paul Niesen was employed by the Hawaii Department of Public Safety (DPS) as a social worker at Halawa Correctional Facility (HCF).  Dkt. No. 146-1, ¶¶ 1, 4.  Niesen worked under the direction of Defendant Keone Morreira, who was employed by DPS as a corrections supervisor at HCF.  Dkt. No. 146-2, ¶¶ 1, 4; Dkt. No. 119-16 at 5.  Morreira's supervisor was the HCF Residency Section Administrator, Dovie Borges.  Dkt. No. 146-2, ¶ 12.

In May 2016, Gordon was an inmate at HCF, where he was housed in Module 3:B:2, a few cells away from inmates Shalom Tuimalealiifano (Shalom) and John Talo (Talo).  Dkt. No. 159, ¶¶ 3–4; *see also* Dkt. No. 113-7.  It was common knowledge among inmates and HCF staff that Shalom and Talo were prison gang

leaders.  Dkt. No. 159, ¶¶ 4, 18.  Gordon, and at least some of HCF's staff, knew that Shalom and Talo had directed "hits" or attacks on other inmates through their gang member comrades at HCF.  *Id.* at ¶ 18; *see also* Dkt. No. 152-12 (noting a January 2016 incident that occurred at the direction of Talo as the "Enforcer").  HCF records specifically note that Shalom was a member of the "Sons of Samoa Crips" or "SOS Crips," and Talo was a member of the "SOS/USO Family."  Dkt. No. 152-11 at 1–2; Dkt. No. 149-23 at 75, 137.  Around July 2015, when Shalom was moved from a "special holding unit," Morreira completed Shalom's housing "classification" form and spoke with Shalom.  Dkt. No. 149-23 at 26–27; Dkt. No. 152-11 at 4.  In doing so, Morreira noted that Shalom was "assaultive" and recommended housing Shalom in Module 6, a "special needs facility" that is "separated from the general [prison] population."  Dkt. No. 149-23 at 90–91; Dkt. No. 152-11 at 4.

On the evening of June 6, 2016, Gordon was walking back to his cell when he was pulled into a cell and beaten by Shalom and Talo.  Dkt. No. 159, ¶¶ 5–7.  They threatened Gordon and told him not to tell anyone.  *Id.* at ¶ 7.  Gordon and his cellmate called for help, but Gordon refused to tell the guards what happened for fear of retaliation.  *Id.* at ¶¶ 8–9, 11.  Gordon was transported to the emergency room at an off-site hospital where he remained under the medical care of Dr. Thomas Craig from June 7 through June 14, 2016.  *Id.* at ¶¶ 10, 13–14.  On June 14, 2016, Gordon underwent surgery to repair multiple fractures in his jaw, which required inserting

metal plates and screws.  *Id.* at ¶¶ 12, 15; Dkt. No. 149-4.  The next day, Gordon returned to the medical unit at HCF.  Dkt. No. 159, ¶ 15.

### B.     The Separatee Request

On Friday, June 17, 2016, HCF Module 3 Unit Manager Lauri Lee-Zidek initiated a Separatee Request on Gordon's behalf.  Lee-Zidek signed and dated the Separatee Request, noted Shalom as the inmate Gordon was to be separated from, and indicated the reason for the request.  *See* Dkt. No. 146-2, ¶¶ 6–7; Dkt. No. 159, ¶¶ 24–25.  Gordon asserts that he did not initiate this request or speak with Lee-Zidek.  Dkt. No. 159, ¶¶ 23–24.  Nonetheless, that day, the Separatee Request was routed to Defendant Morreira, the supervisor of the case manager for the medical unit.  Dkt. No. 146-2, ¶ 6; Dkt. No. 113, ¶ 10.

On June 19, 2016, while Gordon was still recovering in the HCF medical unit, he submitted an "Informal Resolution" regarding the June 6 assault.  Dkt. No. 159, ¶ 19.  In the Informal Resolution, Gordon asked that he "be kept safe and out of harms [sic] way during the healing process" and "be put in a Module like 4 when [he] healed," not "back in a hostile situation."  *See* Dkt. No. 149-16.  Gordon did not identify his attackers or refer to specific inmates.[2]

---

[2]Morreira did not respond to Gordon's Informal Resolution until June 27, 2016 (after the second assault), stating "you are currently housed in SHU [Special Holding Unit] med[ium] for PC [Protective Custody] assessment.  A formal [S]eparatee has been filled out for 2 inmates.  Seek the help of the UTM [Unit Manager] of the SHU."  *See* Dkt. No. 149-16 at 2; Morreira Dep., Dkt. No. 149-23 at 38:19–24.  Contrary to what Morreira indicated on the form, Morreira has since admitted that he never "discussed" the Informal Resolution with Gordon.  *See* Morreira

On Monday morning, June 20, 2016, Morreira believes he received Gordon's Separatee Request. Dkt. No. 149-23 at 79–81. That same morning, Morreira asked Niesen to meet with Gordon regarding the Separatee Request. Dkt. No. 146-2, ¶ 8. Gordon avers that Niesen arrived at the medical unit that morning with a piece of paper and "a notebook." Dkt. No. 159, ¶ 20. Although Gordon assumed the visit was in response to the June 19 Informal Resolution he had submitted, Gordon soon learned otherwise. *Id.* Niesen had brought a partially filled out Separatee Request, dated June 17, 2016, which included Gordon's name, Lee-Zidek's name, and Shalom's name. *See* Dkt. No. 159, ¶¶ 20, 24–25; Dkt. No. 149-18 (Separatee Request).[3] When Gordon asked Niesen "how he got Shalom's name and who had put his name on [the Separatee Request] form," Niesen allegedly responded that he had his "sources." Dkt. No. 159, ¶ 25. Niesen further explained that "everyone knew what had happened" and asked Gordon if he wanted protection from certain inmates. *Id.* at ¶ 20. Gordon was initially "skeptical" whether the guards could protect him and worried that he might be labeled a "rat" for simply talking to Niesen. *Id.* According to Gordon, Niesen stated that "unless [he] told him what happened

---

Dep., 149-23 at 38; Dkt. No. 149-16.

[3]Gordon avers that before meeting with Niesen on June 20, 2016, he "never met with or talked to Laura Lee-Zidek, Monica Chun, or Keone Morreira regarding [his June 6] attack"; "had not disclosed to anyone the names of the persons who had attacked and beaten [him] on June 6, 2016"; and other than medical staff, "did not meet with any case manager or unit manager or prison staff." *See* Dkt. No. 159, ¶¶ 22–25.

and signed the form that [he] would be sent back into the general population and most likely right back into Module 3." *Id.* at ¶ 21.

Believing that the only way to be protected from Shalom, Talo, and their cohorts was to sign the Separatee Request, *id.* at ¶ 26, Gordon obliged and told Niesen the details of the June 6, 2016 attack, including that Talo was the other inmate involved. *Id.* at ¶ 27. At Gordon's request, Niesen added Talo's name to the Separatee Request. *Id.* at ¶ 24. Gordon then wrote the following on the form as his reason for the request: "These two gentlemen [Shalom and Talo] were involved in the incident that put me in the medical unit and **I need to be separated from them other USO's**." Dkt. No. 149-6 at 2 (emphasis added); Dkt. No. 159, ¶ 29. Gordon signed and dated the form, as Niesen directed. *Id.*[4]

After meeting with Gordon, Niesen completed an Incident Report, Dkt. No. 149-19, which included the information Gordon provided that morning in the medical unit. Dkt. No. 146-1, ¶ 10. In the report, Niesen noted that "Gordon expressed repeated concerns that providing this information would make him a target for retaliation by IM [Shalom], IM Talo, and other members of the STG group ["security threat group"] USO Family, which IM Gordon believes that the other

---

[4]The parties dispute whether Niesen promised that the Separatee Request would be granted. Gordon maintains that he "trusted in [Niesen]'s representations that a separatee request would be granted and [he] would be kept separate and away from Talo and Shalom, as well as their gang members." Dkt. No. 159, ¶ 30. Niesen contends, however, that he "did not promise that [he] could ensure [Gordon]'s safety" and he "did not have the authority to ensure [Gordon]'s safety, or the authority to make any promises about [Gordon]'s safety." Dkt. No. 146-1, ¶ 9.

inmates listed in his report are affiliated with." Dkt. No. 149-19.[5] Niesen then personally delivered to Morreira (1) his Incident Report, and (2) Gordon's Separatee Request, which was the last time Niesen claims he saw the Separatee Request. *See* Dkt. No. 146-1, ¶ 12; Dkt. No. 119-16 at 7; Dkt. No. 149-23 at 32, 42, 69.

After receiving the Incident Report and Separatee Request, Morreira read Niesen's Incident Report. Dkt. No. 149-23 at 32:20–22. Morreira wrote his name on the Incident Report in the space labeled "Thru" and "Watch Supervisor," and wrote "Dovie Borges" in the space labeled "To" and "Administrator/Section Supervisor." Dkt. No. 149-19; Dkt. No. 149-23 at 70–72:13.[6] Morreira then

---

[5]Staff at HCF use the term "security threat group," instead of "gang," when referring to prison gang affiliations. Dkt. No. 149-23 at 74–75.

[6]Morreira claims that he was not actually the "watch supervisor" at the time and, rather than change the words on the form, he simply wrote his name in the space provided for the "Watch Supervisor" because, according to Morreira, "[the request] went through me to [Borges]." Dkt. No. 149-23 at 72:15–20. In any event, DPS correctional facility policies and procedures state:

> Grievances of an exigent nature requiring an immediate resolution or a more expedited process may be given emergency status, and put on a fast-track process.
>
> No stage of the grievance program should be deleted as each step provides a level at which administrative action can be taken . . .; however, each step can be accelerated.
>
> Emergency grievances might include, but would not be limited to grievances related to . . . [t]he risk of death or serious harm, and . . . [o]ther matters for which delay would significantly prejudice or harm the inmate, if not immediately resolved.

Dkt. No. 149-20 at 6. As Morreira explains it, a separatee request may be granted in an emergency by "the watch supervisor at that time, if there's no other authority higher than him at the time of that call. So, the captain can make the call. Then it goes to the administrative captain, the chief of security, the deputy warden, the warden. So, depending on how you want to state it, it -- a watch supervisor, which would be the captain or higher, could make an emergency decision." Dkt. No.

accessed Offendertrak, DPS's computer database that contains the correctional facility information for inmates, *e.g.*, security identifier (SID), release status, custody level, housing classification evaluations, "Alerts," and STG "gang" affiliation. *See* Dkt. No. 149-23 at 33–34, 57, 76, 84, 86–87.

Using Offendertrak, Morreira located the records for Shalom and Talo. On the Separatee Request, Dkt. No. 149-18, Morreira wrote the inmate number for Shalom and Talo and (based on the Incident Report) noted that they "assaulted [Gordon]." Dkt. No. 149-23 at 33–34, 66; Dkt. No. 119-16 at 7. Next to Talo's name and inmate number, Morreira wrote "medium" (referring to medium-security status) and "SOS/USO." Dkt. No. 149-23 at 75, 82; Dkt. No. 113-12 at 10–11. Next to Shalom's name and inmate number, Morreira wrote "medium" and "SOS crips." Dkt. No. 149-23 at 82; Dkt. No. 119-16 at 7; Dkt. No. 125-4 at 5–6. Morreira signed and dated Gordon's Separatee Request and wrote "Recommend Separatee" on the first page. Dkt. No. 149-23 at 61–62. Morreira stated that he made the recommendation "[b]ased on his professional experience" because Gordon had "stated that he was allegedly assaulted by the two inmates mentioned on the request." *See id.* at 41, 43–44. According to Morreira, he is "required" to provide a recommendation "with an explanation" on a separatee request. *Id.* at 44.

---

149-23 at 73:14–74:2.

At about 12:30 PM on Monday, June 20, 2016, Morreira placed Gordon's Separatee Request and the Incident Report in the office of Dovie Borges, Morreira's supervisor.  Dkt. No. 149-23 at 42, 45; Dkt. No. 125-4 at 6–7.  Under "Statement of Action" on the Separatee Request, Dkt. No. 149-18 at 2, Borges wrote: Interviewed Shalom . . . on 6/16/16 in module 3 regarding kites and complaints by inmates.  IM Shalom is threatening or terrorizing certain inmates.  Shalom denies complaints.  Separatee is recommended.  See attached CM [case manager] report.  D. Borges 6/20/2016."  *See id.*; Dkt. No. 149-23 at 62:6–16.

Warden Sequiera approved Gordon's Separatee Request by signing at the bottom of the second page.  Dkt. No. 149-18 at 2; Dkt. No. 113-12 at 12.  The parties dispute when this approval was issued, as the date next to Sequiera's signature is illegible.[7]  Morreira interpreted the date as "maybe 6-21-16," Dkt. No. 149-23 at 62:21, and Offendertrak records for Shalom and Talo mention Gordon in a segregation note with the "date from" as "06/21/2016."  Dkt. No. 152-11 at 1–2.

---

[7]DPS represents that it is Warden Sequiera's signature at the bottom of page two of Gordon's Separatee Request.  Dkt. No. 113-12 at 12.  However, Defendants' only evidence regarding the approval date is the testimony of HCF Program Control Administrator Gary Kaplan.  Dkt. No. 63-3, ¶ 10; *cf.* Dkt. No. 63, ¶ 24.  Gordon contends Kaplan's testimony is inadmissible and based on hearsay.  Dkt. No. 113, ¶ 24.  Gordon is on solid ground.  Although Kaplan states that he has "personal knowledge," his declaration is devoid of "*evidence* . . . sufficient to support a finding that [he] has personal knowledge of the matter."  Fed.R.Evid. 202 (emphasis added).  Indeed, the date on the Separatee Request is illegible, and Kaplan does not allege that he witnessed Sequiera approve the request on June 20, 2016.  To the extent Kaplan is simply relaying what is perhaps stated in other documents in his possession, his testimony is based on hearsay.  Fed.R.Evid. 505.

In Gordon's final approved Separatee Request, under the heading "Reason For Request," a mark or "1" was placed next to the option for "Threat to . . . Life or Limb." Dkt. No. 119-6. According to DPS, it is "unknown" who made the mark. Dkt. No. 113-12 at 11.[8]

### C.    The Second Assault – June 20, 2016

On the evening of June 20, 2016, Gordon was transferred out of the HCF medical unit. Dkt. No. 159, ¶ 31. Gordon believed the move was a result of the Separatee Request he had filled out with Niesen earlier that morning. *Id.* Upon his release from the medical unit, Gordon was immediately taken to Module 1, which allegedly housed members of Shalom's gang. *Id.* Shortly thereafter, Gordon was confronted in Module 1 by members of Shalom's gang. *Id.* at ¶ 33. Gordon was directed upstairs and pulled into one of the cells where he was violently attacked by Kevin Govea and another unidentified inmate. *Id.* Gordon sustained multiple closed-fist blows to his head and body, and the inmates threatened Gordon with further harm if he told anyone about the source of his injuries. *See id.*

On June 21, 2016, Gordon was taken to the medical unit for his prescribed narcotics. Dkt. No. 159, ¶ 34. When the nurse asked Gordon about the deep cut above his eye, Gordon lied and said that he had fainted and fallen while using the

---

[8]Morreira, for instance, denies that he made the mark next to "Life or Limb." Dkt. No. 149-23 at 68.

toilet.  *See id.* at ¶ 35; Dkt. No. 113-13.  After receiving stitches at an off-site hospital, later that night Gordon followed the directions of Sergeant Dixon and requested to be placed in protective custody.  *See* Dkt. No. 159, ¶¶ 37–39; Dkt. No. 149-7 (Gordon's statement); Dkt. No. 149-8 (Captain Su'apaia's completed administrative segregation request).  Pending a determination on his protective custody request, Gordon was temporarily placed in a segregated, special housing unit.  *See* Dkt. No. 159, ¶ 41; 149-23 at 27.  In the subsequent Administrative Remedy form Gordon submitted on June 25, 2016, Dkt. No. 149-11, Gordon noted the two recent assaults, his previous request "to be separated from two individuals and USO" gang members, that USOs were housed in Module "1B1," and that he only felt he would be safe in Module 4.  *Id.*; Dkt. No. 159, ¶¶ 43.[9]

On June 30, 2016, Gordon followed up on his protective custody request and received a response denying his request because his "application was too vague." Dkt. No. 159, ¶¶ 45–47; Dkt. No. 149-9.  Gordon was notified on July 7, 2016, that he would be moved back into the general prison population.  Dkt. No. 159, ¶ 48.  To avoid this result, Gordon refused to accept the transfer and was placed in solitary confinement where he remained until July 22, 2016.  *Id.* at ¶¶ 49–50.

---

[9]Two months later, on August 11, 2016, Morreira denied Gordon's Administrative Remedy request, stating "Module 4 is reserved for workline inmates in programs.  You do not have the luxury of choosing your housing unit. . .You are currently in Module 6/PC quad where separation from GP is warranted at this time.  Seek assistance from your assigned case manager or correctional officers of the module for further help if any conflicts occur or your safety is being jeopardized.  Be safe!"  Dkt. No. 149-11 at 2; Dkt. No. 159, ¶ 44.

In November 2016, Gordon underwent a second surgery to repair the damage caused to his jaw bones when they were healing.  *Id.* at ¶ 53.  Although Gordon was transferred to Saguaro Correctional Center in Arizona in 2017, Gordon has since been transferred back to HCF, where he is currently housed.  *Id.* at ¶¶ 1, 56.

### D.   Procedural History

Gordon filed this action under 42 U.S.C. § 1983 on October 30, 2017.  Dkt. No. 1.  In Gordon's second amended complaint (SAC), Dkt. No. 34, he names Morreira, Niesen, and Dr. Craig as Defendants, and asserts a failure-to-protect claim under the Eighth Amendment, as well as a negligence claim, arising from the second inmate attack on June 20, 2016.  *See id.* at ¶¶ 2, 42, 52, 59.

Over a year ago, on March 5, 2019, Defendants moved for summary judgment on Gordon's Eighth Amendment claim, Dkt. No. 62, arguing that they did not know there was a substantial risk of harm to Gordon, did not have the authority to approve or deny Gordon's Separatee Request, and did not have authority over or involvement in Gordon's housing placement after he was released from the medical unit on June 20, 2016.  *See* Dkt. No. 62-1 at 1–2, 11–12.  After the Court appointed counsel for Gordon, Dkt. Nos. 68, 86, 101, the briefing schedule on Defendants' summary judgment motion was continued multiple times, Dkt. Nos. 73, 90, 97, 105.  On January 15, 2020, Gordon filed his opposition, Dkt. No. 112, and a concurrent Rule 56(d) motion to defer summary judgment until he received further discovery from

Defendants, such as correctional facility documents and classification records.  Dkt. No. 114.  After hearing oral argument on both motions, Dkt. No. 128, on February 27, 2020, the Court granted Gordon's Rule 56(d) motion and ordered Gordon to file his supplemental brief and concise statement of facts by April 13, 2020 and Defendants to do the same by April 23, 2020.  Dkt. No. 134.  Each party's deadline was later extended by a month.  Dkt. No. 144.   In the interim, Defendants filed a motion for summary judgment on Gordon's negligence claim.  Dkt. No. 145.

Defendants' motions for summary judgment, Dkt. Nos. 62, 145, have been fully briefed by all concerned and are now ripe for resolution.

## STANDARD OF REVIEW

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A genuine dispute of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson*, 477 U.S. at 249; *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## DISCUSSION

Niesen and Morreira advance two principal arguments in support of their motions for summary judgment.  First, with respect to Gordon's Eighth Amendment failure-to-protect claim under 42 U.S.C. § 1983, Defendants maintain that they are entitled to qualified immunity. Second, as to Gordon's negligence claim, Defendants contend they are shielded by qualified privilege under Hawaii law.  Addressing each of Defendants' defenses *seriatim*, the Court concludes that a jury trial is warranted.

## I.    Qualified Immunity as to Gordon's Eighth Amendment Claim

The doctrine of qualified immunity shields government officials from liability for civil damages unless the plaintiff establishes: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  These inquiries may be addressed in any order.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "'[W]hether a constitutional right was violated . . . is a question of fact' for the jury, while 'whether the right was clearly established . . . is a question of law' for the judge." *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017) (quoting *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009)).  This "bifurcation of duties is unavoidable: only the jury can decide the disputed factual issues, while only the judge can decide whether the right was clearly established once the factual

issues are resolved." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018) (quoting *Morales*, 873 F.3d at 824–25)).  Because there is a genuine dispute as to various material facts here, Defendants are not entitled to summary judgment on qualified immunity.

## A.    Legal Framework: Eighth Amendment Failure-to-Protect Claim

A jury could conclude that Defendants violated Gordon's Eighth Amendment right to be protected from assault by fellow inmates.  "[P]rison officials have a duty [under the Eighth Amendment's prohibition of cruel and unusual punishment] to protect prisoners from violence at the hands of other prisoners" because "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."  *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994) (citations and internal quotation marks omitted).  "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  *Id.* at 834.  For a failure-to-protect claim to lie against a prison official, the plaintiff must show that: (1) he was "objectively" exposed to a "substantial risk of serious harm"; and (2) the official was "subjectively aware of the risk" and responded with "deliberate indifference" by "failing to take reasonable measures to abate it."  *See Farmer v. Brennan*, 511 U.S. 825, 834, 828–29 (1994); *id.* at 847; *Lemire v. Cal.*

*Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013); *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005).  Both requirements are met here.

### 1.  Substantial Risk of Serious Harm

There is no question that -- "objectively" -- there was a "substantial risk of serious harm" to Gordon before the June 20, 2016 assault.  *See Farmer*, 511 U.S. at 834, 846.  On June 6, 2016, Gordon was violently assaulted by two known gang leaders at HCF, Shalom and Talo, both of whom had a propensity for violence toward other inmates and had threatened to harm Gordon again in the future if he told anyone about the June 6 assault.  Dkt. No. 152-11 at 1–2; Dkt. No. 149-23 at 75, 137.  Gordon suffered a broken jaw from the assault that required off-site surgery and rehabilitation.  On June 20, Gordon spoke directly with Niesen about the assault and made a written request to be separated from Shalom, Talo, and "them other USOs."  Dkt. No. 149-18.  Based on these objective facts, there was a substantial risk that Gordon would be attacked by Shalom, Talo, or a member of one of the gangs with which they were affiliated.

### 2.  Subjective Knowledge of the Risk to Gordon's Safety

With respect to the subjective component, a jury could also conclude that Morreira and Niesen acted with deliberate indifference toward Gordon's health and safety.  The deliberate indifference standard requires that "the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Farmer*, 511 U.S.

at 842. In other words, "a prison official may be held liable under the Eighth Amendment . . . if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (emphasis omitted) (quoting *Farmer v. Brennan*, 511 U.S. at 847). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from *circumstantial evidence*, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (emphasis added; internal citation omitted).

Here, a reasonable jury could find that Defendants subjectively knew of the risk that Gordon would be assaulted by Shalom, Talo, or USO/SOS gang members because that risk was "obvious." *See Farmer*, 511 U.S. at 842. Several prominent facts lead to this conclusion: Gordon was still in the medical unit following the first assault when he told Niesen about the assault and his attackers; Niesen allegedly promised to ensure Gordon's safety; Gordon wrote in the Separatee Request that he wished to be separated from Shalom, Talo, and "them other USOs"; all the information was documented in the Separatee Request and Niesen's Incident Report; Morreira reviewed both documents; Morreira himself accessed Offendertrak and noted the gang affiliations for Shalom and Talo; and Morreira *obviously* believed that Gordon was at risk of harm because Morreira recommended that the Separatee

- 17 -

Request be granted.  As such, there are ample facts in the record for a jury to find that Defendants actually knew there was a substantial risk to Gordon's safety.

Defendants maintain, however, that "they could not have subjectively recognized the risk that [Gordon] would be assaulted by Kevin Govea on June 20, 2016" because "Govea's name was never brought up by [Gordon]."  *See, e.g.*, Dkt. No. 158 at 3–4.  According to Defendants, the only "risk that could be said to have been known" to them "was the risk of assault from Shalom and Talo."  Dkt. No. 158 at 8.  But that argument is hollow under *Farmer*.  A prison official cannot "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by *the specific prisoner who eventually committed the assault*."  *Farmer*, 511 U.S. at 843 (emphasis added); *Thomas v. Ponder*, 611 F.3d 1144, 1151 (9th Cir. 2010) ("*Farmer*'s obviousness requirement does not necessitate a showing that an individual prison official had specific knowledge that harsh treatment of a particular inmate, in particular circumstances, would have a certain outcome.").  "[A]nd it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."  *Farmer*, 511 U.S. at 843.

Here, it bears emphasis that Gordon did not merely request to be separated from Shalom and Talo, as Defendants seemingly imply; Gordon also stated, "I need to be separated from them other USOs."   Dkt. No. 149-18.   Indeed, Niesen understood this, and passed his understanding on to Morreira, because Niesen noted in his Incident Report: "Gordon expressed repeated concerns that providing this information would make him a target for retaliation by IM [Shalom], IM Talo, and other members of the STG group ["security threat group"] USO Family . . ."   Dkt. No. 149-19.   Contrary to Defendants' narrow view regarding what constitutes an obvious risk, "obviousness" is measured "in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved."   *Thomas*, 611 F.3d at 1151.   Based on the facts in the record, transferring Gordon from the medical unit to a housing unit where Shalom, Talo, or USO/SOS gang members also had access was sure to result in a second assault on Gordon that, in this case, came almost immediately.   Because Gordon has "present[ed] evidence of very obvious and blatant circumstances indicating that [Defendants] knew [a substantial risk of serious harm] existed, . . . it is proper to infer that [Defendants] must have known of the risk."   *Thomas*, 611 F.3d at 1152 (9th Cir. 2010) (quoting *Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2009)).   Any further argument to the contrary is one that must be presented to a jury.

### 3.  Reasonableness of Defendants' Actions

The remaining question is whether Defendants Niesen and Morreira are entitled to avoid liability, as a matter of law, because they "responded reasonably to the risk, even if the harm ultimately was not averted."  *See Farmer*, 511 U.S. 844. This inquiry is "fact-intensive and typically should not be resolved at the summary judgment stage."  *See, e.g.*, *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013); *Thomas*, 611 F.3d at 1152.  Defendants assert that they did not have the authority to approve Gordon's Separatee Request, or authority over Gordon's housing placement, and thus, they contend their actions were reasonable.[10] The Court disagrees, as Defendants' declarations amount to little more than a bald denial of any authority to immediately provide Gordon with protection.

Defendants have not cited to any description of their job duties or DPS policy constraining their authority.  Morreira, in particular, testified that he did not know of *any* written guidelines or procedures regarding: (1) the granting or denying of a separatee request, Dkt. No. 149-23 at 19; (2) how informal requests are to be handled, *id.* at 56–57; and (3) who had the authority to move an inmate from the medical unit to a housing unit, other than to merely assert that "it's known that [he] cannot, as a unit manager, make that call," only the "chief of security or higher" may do so, *id.* at 47:11–50:12.  In the absence of any formal policy regarding these

---

[10]Dkt. No. 62-1 at 12; Dkt. No. 146-1, ¶¶ 13; Dkt. No. 146-2, ¶ 14.

matters, a jury may find that under the circumstances, Defendants could, and should, have done more than simply forward the Separatee Request and Incident Report to the next official in the HCF hierarchy.  If it were otherwise, there would indeed be a perverse incentive to insulate prison officials from liability by leaving the official to determine their duties and the prison's policies on an ad-hoc basis after the official is sued.  The Court declines to endorse that approach or facilitate that result here.

The Court is also not persuaded by Morreira's contention that "[o]nly HCF Warden Francis Sequiera had the authority to approve or deny Separatee Requests." Dkt. No. 146-2, ¶ 12.  Morreira's statement is called into question by his previous deposition testimony.  Morreira testified that a "watch supervisor" may grant a separatee request in an emergency if no higher authority is present at the time.  Dkt. No. 149-23 at 73:14–74:2.  The threat to "Life or Limb" here would certainly qualify as such an emergency, and Morreira signed the Incident Report as the "watch supervisor."  Dkt. No. 149-19.  While Morreira may not have formally held such a title, Morreira nonetheless was the individual through whom the Separatee Request was submitted to Borges, giving rise to the reasonable inference that Morreira was, effectively, the "watch supervisor" at the time.  Moreover, Morreira admitted that he has the authority, with approval, to make "module-to-module" housing assignment moves for inmates in the general population, *i.e.*, moves between Modules 1, 2, 3, and 4.  *See* Dkt. No. 149-23 at 47:19–48:7.  As such, Gordon's contention that

Niesen or Morreira or both of them could have acted under the exigent circumstances to expedite the Separatee Request and ensure proper implementation, Dkt. No. 151 at 7, is not "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Nor is it of any import, as Defendants assert, that they did not participate in Gordon's transfer or know where he was transferred. Dkt. No. 158 at 2, 6; Dkt. No. 146-1, ¶ 14; Dkt. No. 146-2, 14. "[I]t is enough that [Defendants] acted *or failed to act* despite [their] knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842 (emphasis added). Thus, "a prison official's act *or omission*" may form the basis for an Eighth Amendment failure-to-protect claim when the official knows that an inmate "face[s] a substantial risk of serious harm and disregards that risk *by failing to take reasonable measures to abate it*." *Farmer*, 511 U.S. at 834, 847 (emphasis added); *Clem v. Lomeli*, 566 F.3d at 1181–82.

Here, the evidence regarding what was "reasonable" at the time Gordon was moved to a module where members of Shalom's gang were housed is essentially the parties' competing assertions. There are several different ways a jury may conclude that it was unreasonable for Niesen or Morreira to have failed to: note which housing modules contained known USO/SOS gang members; recommend housing Gordon in Module 4; recommend keeping Gordon in the medical unit where he appeared to have no issues during his rehabilitation; immediately grant the Separatee Request

and move Gordon from medical to a segregated holding unit until a suitable cell could be identified; or follow up on the Separatee Request. Thus, although Defendants forwarded the Separatee Request and Incident Report to their respective supervisor, a jury may find that that was not enough.

In sum, there are material issues of fact regarding whether Defendants knew that Gordon was at a substantial risk of being assaulted a second time by USO or SOS gang members, and whether Defendants acted with deliberate indifference by failing to take reasonable measures to avert that risk. A jury could reasonably conclude that Defendants violated Gordon's Eighth Amendment rights by failing to protect him from violence at the hands of fellow inmates.

## B.    Clearly Established Law

Government officials who violate citizens' constitutional rights may still be entitled to qualified immunity unless "the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation and internal quotation marks omitted). "It is not necessary, of course, that the very action in question has previously been held unlawful." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (citations and internal quotation marks

omitted).  And "general statements of the law are not inherently incapable of giving fair and clear warning to officers."  *See, e.g.*, *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation and internal quotation marks omitted); *Hope v. Pelzer*, 536 U.S. 730, 741–46 (2002).  This differs from other contexts, such as in law enforcement excessive force cases, an area of the law where the Court has been more exacting in requiring that "existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (citing *Mullenix*, 136 S. Ct. at 310).

Viewing the facts here in the light most favorable to Gordon, Gordon's Eighth Amendment right was clearly established.  "The Supreme Court need not catalogue every way in which one inmate can harm another . . . to conclude that a reasonable official would understand that his actions violated [the Eighth Amendment]." *Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020) (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016) (*en banc*)).  "Once an official is subjectively aware of a substantial risk of serious harm, 'clearly established' law requires . . . 'that the [official] take reasonable measures to mitigate the substantial risk.'" *Id.* (citation omitted).

In *Wilk v. Neven*, the Ninth Circuit denied qualified immunity to a prison warden, an associate warden, and a prison caseworker.  956 F.3d at 1145, 1149–50. There, the plaintiff had been threatened by another inmate and filled out documents for protection, requesting that the inmate be placed on plaintiff's "enemy list."  *Id.*

at 1145–46.  Plaintiff was moved, but the other inmate was not placed on plaintiff's enemy list.  *Id.* at 1146.  Plaintiff was attacked by the other inmate "over three months later" while in the yard.  *Id.* at 1146, 1149.  As for what went wrong, the warden and the associate warden disputed whether they attended the classification meetings or had knowledge of the threat after receiving plaintiff's documents.  *Id.* at 1146–47.  The prison caseworker, as relevant here, attended the classification meeting but argued that although he may have made "a clerical mistake regarding assigning [the threatening-inmate] to the enemy list," it was "not his job to update the prison's records system."  *Id.* at 1146.  Although there were facts in dispute, viewing the record in the light most favorable to the plaintiff, the court concluded that a jury could find in favor of plaintiff.  *Id.* at 1149–50.  Because the right at issue had "been clearly established since the Supreme Court's decision in *Farmer v. Brennan* in 1994," the court denied qualified immunity to all three defendants.  956 F.3d at 1150.

As in *Wilk*, and based on the principles announced in *Farmer*, Defendants are not entitled to qualified immunity.  Moreover, Defendants' "claims of qualified immunity hardly present 'purely legal' issues capable of resolution 'with reference only to undisputed facts.'"  *See Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 n.10 (1985)).  "Cases fitting that bill typically involve contests not about what occurred, or why an action was taken or omitted,

but disputes about the substance and clarity of pre-existing law." *Id.* "[T]he pre-existing law [is] not in controversy." *Id.* (citing *Farmer*, 511 U.S. at 834, 847). Rather, what is disputed are "the facts that could render [Niesen and Morreira] answerable for crossing a constitutional line." *Id.* As noted, these disputed facts include: "Was [Niesen and Morreira] adequately informed, after the first assault, of the identity of the assailant . . . ? What, if anything, could [Defendants] have done to distance [Gordon] from the assailant, thereby insulating [him] against a second assault?" *Id.*

For these reasons, Defendants are not entitled to qualified immunity on Gordon's Eighth Amendment failure-to-protect claim. *See Reese*, 888 F.3d at 1037 (quoting *Morales*, 873 F.3d at 824–25)).

## II.   Qualified Privilege as to Gordon's Negligence Claim

With respect to Gordon's negligence claim, the Court concludes that Defendants are not entitled to the qualified privilege under Hawaii law. Under Hawaii law, non-judicial employees acting in the performance of their duties enjoy a "qualified privilege" that generally protects them from individual liability for tortious acts. *See Awakuni v. Awana*, 165 P.3d 1027, 1041–42 (Haw. 2007) (quoting *Medeiros v. Kondo*, 522 P.2d 1269, 1272 (Haw. 1974)); *Towse v. State*, 647 P.2d 696, 702 (Haw. 1982). If, however, "in exercising his or her official authority the public official was motivated by malice, and not by an otherwise proper purpose, the

cloak of immunity is lost and the official must defend the suit the same as any other defendant."  *Marshall v. University of Hawaii*, 821 P.2d 937, 946 (Haw. 1991). Here, Defendants contend there is no evidence to support a finding that they acted with "malice."  Dkt. No. 145-1 at 5, 8; Dkt. No. 155 at 4–7.  The Court disagrees.

A jury could find that Defendants acted with malice.  "Malice," in this context, is defined in its "ordinary and usual sense" as "[t]he intent, without justification or excuse, to commit a wrongful act[,]" "reckless disregard of the law or of a person's legal rights[,]" and "[i]ll will; wickedness of heart."  *Awakuni*, 165 P.3d at 1041–42 (alterations in original) (quoting BLACK'S LAW DICTIONARY 977 (8th ed. 2004)). "The existence of malice is generally for the jury, and summary judgment is only proper on the issue when it has been removed from the case by uncontroverted affidavits or depositions."  *Marshall*, 821 P.2d at 946 (internal citation omitted). Having concluded above that Defendants are not entitled to qualified immunity because a jury could find that Defendants acted with deliberate indifference toward a substantial risk of harm to Gordon, it follows that the facts are sufficient to support a finding of "malice" in that a jury could conclude that Defendants acted with "reckless disregard of the law or of [Gordon]'s legal rights."  *Awakuni*, 165 P.3d at 1042; *Farmer*, 511 U.S. at 836 ("It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the

equivalent of recklessly disregarding that risk."). Accordingly, Defendants are not entitled to immunity under Hawaii law at this juncture.

In sum, issues of material fact preclude summary judgment because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255; *see also Bourjaily v. United States*, 483 U.S. 171, 179–80 (1987) ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it."). Having carefully reviewed the record in the light most favorable to Gordon, the Court is convinced that a jury trial is warranted. Defendants' motions are, therefore, DENIED.

## CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment regarding alleged violations of the Eighth Amendment, Dkt. No. 62, and Defendants' motion for summary judgment on Gordon's negligence claim, Dkt. No. 145, are both DENIED.

IT IS SO ORDERED.

DATED: June 17, 2020 at Honolulu, Hawaiʻi.

Derrick K. Watson
United States District Judge

*Scott Lee Gordon v. Paul Niesen, et al.*; Civil No. 17-00541-DKW-KJM; **ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**